938 F.2d 492
 DORIS COAL COMPANY; Old Republic Insurance Company, Petitioners,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR; Noah Stiltner, Respondents.
 No. 90-2737.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 10, 1991.
Decided July 3, 1991.
As Amended Aug. 5, 1991.
 
 Mark Elliott Solomons, Arter & Hadden, Washington, D.C., for petitioners.
 Eileen Mary McCarthy, argued, Office of Sol., U.S. Dept. of Labor, Washington, D.C., for respondents; Robert P. Davis, Sol. of Labor, Donald S. Shire, Associate Sol., Barbara J. Johnson, Counsel for Appellate Litigation, Office of Sol., U.S. Dept. of Labor, Washington, D.C., on brief, for respondent Director; Vernon M. Williams, Wolfe & Farmer, Norton, Va., on brief, for respondent Stiltner.
 Before RUSSELL, Circuit Judge, CHAPMAN, Senior Circuit Judge, and WILLIAMS, District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 CHAPMAN, Senior Circuit Judge:
 
 
 1
 Appellants Doris Coal Company and Old Republic Insurance Company appeal the decision of the Benefits Review Board (the "Board") of the United States Department of Labor ("DOL") awarding certain health care benefits under the Black Lung Benefits Act to claimant-appellee Noah Stiltner. We affirm in part and reverse in part, and we remand for further proceedings consistent with this opinion.
 
 I.
 
 2
 Stiltner, born in 1925, worked as a coal miner for Doris Coal for 32 years until he became disabled in 1971 at the age of 46. Prior to 1973 Stiltner filed a claim for benefits with the Social Security Administration under part B of the Black Lung Benefits Act ("the Act") and began receiving regular compensation from the Social Security Administration. Part B benefits are monthly cash benefits paid by the federal government to eligible claimants and do not involve the DOL or mine operators such as appellants. However, part B benefits do not include any health care benefits, which were provided for in part C.
 
 
 3
 In 1978, Congress amended part C to allow part B miner-beneficiaries to apply for medical benefits under part C. 30 U.S.C. Secs. 931-945. This aspect of the Act, which is administered by the DOL, established a temporary employer-funded federal workers' compensation program to provide benefits in cooperation with the states for total disability or death due to pneumoconiosis. To set up the structure for the private funding, the amendment incorporated substantial parts of the Longshoremen's and Harbor Worker's Compensation Act ("LHWCA"). 33 U.S.C. Secs. 901-948. The LHWCA provides that the responsible employer or its insurance carrier must pay the cost of medical care needed by the worker as a result of any occupationally related injury or disease that is otherwise compensable. 33 U.S.C. Sec. 907. Thus, part C was implemented to require employers to reimburse disabled miners for medical expenses incurred in the treatment of work related pneumoconiosis.
 
 
 4
 Stiltner filed his part C claim in 1979. The appellants were notified of this claim in March of 1982. Five days later, the appellants agreed to pay the cost of black lung related health care costs that Stiltner had already incurred and would incur throughout his lifetime. The DOL deputy commissioner then issued an uncontested award of benefits to Stiltner requiring appellants to pay all necessary medical expenses incurred in the treatment of his pneumoconiosis. Appellants then began providing benefits, paying out over $22,000 from 1982 to 1986.
 
 
 5
 Sometime during the mid-1980s, Stiltner began going to a Dr. Modi for treatment for his breathing problems. Dr. Modi submitted bills to appellants for treatment, each time listing pulmonary disease as the condition being treated. On seventeen of these bills, Modi noted that the condition treated was not related to Stiltner's employment. Nine of the seventeen billings also included treatment for non-respiratory ailments ranging from hiatal hernia to heart disease. The other eight billings were for some type of respiratory ailment. Stiltner also submitted bills for drugs prescribed by Dr. Modi for testosterone (for impotence), valium, antibiotics, heart medications, antacids, and other drugs to treat gastrointestinal and urinary tract disorders. Appellants did not believe that these treatment and prescription bills related to Stiltner's pneumoconiosis and refused to pay them.
 
 
 6
 Modi notified DOL of appellants' refusal to pay the bills. At the same time, appellants attempted to exercise their right to have Stiltner examined by their doctor. The DOL rejected appellants' request and ordered appellants to pay the disputed bills. Appellants then requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ granted appellants' request for a medical exam, and appellants submitted two medical reports on Stiltner by a Dr. Sutherland[1] to the ALJ. Dr. Sutherland's reports indicated that Stiltner had early stage simple pneumoconiosis, but that most of Modi's treatment bills were not for treatment of this disorder.
 
 
 7
 Although neither Stiltner nor Modi presented any contradictory evidence, the ALJ rejected Sutherland's reports, since the DOL had found in 1982 that Stiltner was totally disabled by his pneumoconiosis rather than other causes. The ALJ rejected appellants' argument that Stiltner's pulmonary disorders were caused by something other than his pneumoconiosis. The ALJ also rejected appellants' request to limit Stiltner's recovery to medical expenses for pulmonary disorders and to deny recovery for the additional but non-related treatment that Modi had included on nine of the seventeen bills in dispute. The ALJ found that it would be impractical "to attempt to separate the number of minutes the doctor spent treating each condition for each hospital or office visit." Since Modi had indicated that he treated Stiltner's pulmonary ailment each time he saw Stiltner, the ALJ concluded that all of Modi's treatments were made as a result of Stiltner's pneumoconiosis. Accordingly, the ALJ ordered appellants to pay all of Dr. Modi's treatment bills. The ALJ also ordered appellants to pay all of the prescription bills relating to the treatment of pulmonary disease and acute bronchitis; however, he denied recovery for the drugs prescribed for non-pulmonary disorders.[2]
 
 
 8
 Appellants then appealed to the Board, arguing that there was no evidence in the record that all of Dr. Modi's treatments were related to the treatment of pneumoconiosis. Three members of the Board found that the ALJ did not err in concluding that it was impractical to require the physician to indicate which treatment was related to the lung disorder. The Board based this finding on the liberal intent of the Act to provide medical benefits to claimants. Two members of the Board dissented. Both members believed that the record did not support the ALJ's decision that the medical bills arose from treatment for the pneumoconiosis. Appellants now appeal the majority's decision.
 
 II.
 
 9
 A claimant is entitled to medical benefits under part C of the Act to pay the cost of medical treatment incurred as a result of his pneumoconiosis. See 20 C.F.R. Sec. 725.701(b). To qualify for these benefits, a claimant must prove (1) that the mine operator should be held generally responsible for the miner's pneumoconiosis and (2) that the particular expense incurred was necessary to treat the miner's pneumoconiosis.
 
 
 10
 A mine operator is responsible for the miner's pneumoconiosis if either (1) it is determined in an adjudication that the miner is totally disabled due to pneumoconiosis, and is, therefore, entitled to benefits under the Act, or (2) the mine operator voluntarily agrees to pay the cost of such treatment by conceding the miner's general eligibility. Lute v. Split Vein Coal Co., 11 Black Lung Rep. (MB) 1-82, 1-84 (1987). In this case, Old Republic voluntarily agreed to pay for treating Stiltner's pneumoconiosis in 1982. Therefore, the only issue in this case is whether Stiltner met his burden of proof in establishing that the medical bills submitted by Dr. Modi were for the reasonable treatment of his pneumoconiosis.
 
 
 11
 Appellants argue that they should not have to pay for any of the seventeen billings submitted by Dr. Modi because Modi's notes indicated that the treatment was not "related to the patient's employment" and because Dr. Sutherland's reports establish that Stiltner's pneumoconiosis had not advanced to the point which would require such extensive treatment. Appellants further argue that, even if they are liable for the treatment of the pulmonary disorders, they should not have to pay for the other medical charges which Modi included on nine of the bills but which concerned unrelated health problems. For the reasons explained below, we affirm the ALJ's finding that appellants cannot challenge Stiltner's expenses related to pulmonary disorders. However, we reverse the ALJ's conclusion that a doctor can bill a mine operator for medical treatment that is unrelated to the miner's pneumoconiosis simply because the treatment was administered at the same time as treatment for pulmonary disorders. We reject the Board's conclusion that it is impractical to require a treating physician to itemize his bill so as to show the nature of his services and whether such services are for treatment of pneumoconiosis. The primary job of the ALJ in this particular proceeding is to find the facts from the evidence presented, and this task must be discharged thoroughly and conscientiously. His findings must separate those medical and drug expenses that are not related to a claimant's respiratory ailments from those expenses that are related.
 
 III.
 
 12
 Even if a miner is entitled to medical benefits from the mine operator under the Act, a mine operator has the right to challenge particular expenses submitted by the miner which do not relate to the miner's pneumoconiosis. To rebut this challenge, the miner must "establish that the medical expenses are related to the injury at hand." Pardee v. Army & Air Force Exchange Service, 13 B.R.B.S. 1130, 1138 (1981). In other words, the miner must show that the medical expenses incurred were necessary to treat the miner's pneumoconiosis.
 
 
 13
 The Act defines pneumoconiosis as a "chronic dust disease of the lung ... arising out of coal mine employment." 30 U.S.C. Sec. 902(b). As we recognized in Hobbs v. Clinchfield Coal Co., 917 F.2d 790, 791 n. 1 (4th Cir.1990), "clinical" or "medical" pneumoconiosis must be distinguished from "legal" pneumoconiosis. Medical pneumoconiosis is "the lung disease caused by the fibrotic reaction of the lung tissue to inhaled dust...." Id. Legal pneumoconiosis, however, is much broader and "refers to all lung diseases which meet the statutory or regulatory definition of being any lung disease which is significantly related to, or substantially aggravated by, dust exposure in coal mine employment." Id.
 
 
 14
 Based on this broad definition, a miner meets his burden of showing that his medical expenses were necessary to treat pneumoconiosis if his treatment relates to any pulmonary condition resulting from or substantially aggravated by the miner's pneumoconiosis. Since most pulmonary disorders are going to be related or at least aggravated by the presence of pneumoconiosis, when a miner receives treatment for a pulmonary disorder, a presumption arises that the disorder was caused or at least aggravated by the miner's pneumoconiosis, making the employer liable for the medical costs.
 
 
 15
 In this case, appellants argue that Stiltner's pulmonary disorders stem from his many years of smoking, therefore, the ALJ erred in requiring the company to pay for medical expenses Stiltner incurred for the treatment of pulmonary disorders not related to his coal mine employment. We reject this argument for several reasons. First, both parties agree that Stiltner's pneumoconiosis caused or at least aggravated Stiltner's other respiratory disorders. Accordingly, Stiltner has met his burden of proving that his pulmonary disorders clearly fall within the definition of legal pneumoconiosis.
 
 
 16
 Second, substantial evidence supported the ALJ's decision that a part of each medical bill was for the treatment of pneumoconiosis. Stiltner testified that he went to Dr. Modi to get help for his breathing difficulties. The medical bills reflect that Dr. Modi treated Stiltner for pulmonary disorders. Finally, the statement of Dr. Modi, as well as Dr. Sutherland's report, establishes that Stiltner suffered from pneumoconiosis.
 
 
 17
 Finally, appellants did not object to the DOL's initial finding in 1982 that Stiltner was disabled and entitled to medical benefits for his pneumoconiosis. Appellants cannot now object to Stiltner's treatment for subsequent respiratory ailments caused by his pneumoconiosis. Any other result would require the miner to prove again that his respiratory ailment is related to his coal mine employment. In addition to the potential res judicata problems, such a requirement would place a significant burden on the Black Lung benefits system, increase litigation costs for all of the parties involved, and further delay important medical benefits that a miner suffering from pneumoconiosis needs. We therefore hold that mine operators can only use subsequent proceedings to challenge the necessity of certain medical charges for the treatment of a pneumoconiosis related disorder or challenge medical charges not related to pneumoconiosis, but the operators may not require the miner to prove again that he has pneumoconiosis each time he makes a claim for health benefits.
 
 IV.
 
 18
 The ALJ also ordered appellants to pay the entire bill for Stiltner's office visits to Dr. Modi, even though some of the expenses arose from treatment unrelated to any type of lung disorder. Of the seventeen "non-employment" related billings submitted by Modi, nine billings included treatment for non-respiratory ailments including hiatal hernia, chest pains, high blood pressure, and heart disease. Modi requested full reimbursement from the DOL on all of the billings. The ALJ determined that since Modi included a diagnosis for some type of pulmonary disorder in each billing, the entire billing was covered by the Act, even it if reflected treatment for a non-pulmonary disorder. The ALJ based this finding on his conclusion that "[i]t is clearly impractical to attempt to separate the number of minutes the doctor spent treating each condition for each hospital or office visit."
 
 
 19
 We reject this reasoning and hold that the ALJ abused his discretion in requiring appellants to pay for medical expenses that were admittedly unrelated to any possible pulmonary disorder. Although Modi treated Stiltner for some type of pulmonary disorder on each visit, it is highly unlikely that Stiltner went to Dr. Modi every time for the primary purpose of receiving treatment for his pneumoconiosis. Nevertheless, under the ALJ's decision, the insurer and company would be liable for any medical treatment whatsoever, as long as Modi rendered some type of pulmonary treatment. The ALJ has abdicated his office as a fact finder when he refuses to find what medical services and charges are related to pneumoconiosis and which are not.
 
 
 20
 This rule of the ALJ and the Board encourages fraud and abuse and does not reflect sound public policy. This rule would allow a doctor to treat any disabled miner entitled to part C benefits for any condition and receive compensation under Part C so long as the doctor mentioned that the patient also was treated for some pulmonary disorder. Part C benefits were never intended to provide comprehensive health benefits and are expressly limited to medical expenses incurred in the treatment of pneumoconiosis. We refuse to read the statute so as to require part C insurers to reimburse claimants for any medical expenses they may incur which are unrelated to the claimant's pneumoconiosis. We also disagree with the ALJ's finding that it is overly burdensome to ask a physician to send his bills to the correct insurer. Doctors are capable of ascertaining the value of particular services rendered and of billing the appropriate paying party, whether it be a general medical insurer, a part C insurer or an uninsured individual. We do not think it is asking too much of the ALJ, or of the Board or doctors to make a proper allocation of medical charges. Accordingly, we hold that a treating physician seeking payment under part C must itemize his bill so it will clearly reflect his charge for the treatment of the pulmonary disorder and separate this from that portion of the bill that applies to the non-pulmonary disorders, and the ALJ must address the issue and make specific findings of fact if the amount of or the allocation of the medical charges is challenged.
 
 
 21
 For the foregoing reasons, the decision of the Board is affirmed in part and reversed in part, and we remand the case for further proceedings consistent with this opinion.
 
 
 22
 AFFIRMED IN PART; REVERSED AND REMANDED.
 
 
 
 [1]
 Dr. Sutherland was Stiltner's physician in 1972 when Stiltner filed his claim for part B benefits
 
 
 [2]
 Appellants do not appeal this part of the ALJ's decision, since the ALJ only required them to reimburse Stiltner for drugs prescribed to treat pulmonary disorders